IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CAROL DENISE NICHOLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-cv-1053-WKW-JTA |
| | ) | (WO) |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### **RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pursuant to 42 U.S.C. § 405(g), the claimant, Carol Denise Nichols ("Nichols") brings this action to review a final decision by the Commissioner of Social Security ("Commissioner"). (Doc. No. 1.)[1] The Commissioner denied Nichols's claim for a period of disability and Disability Insurance Benefits ("DIB"). (R. 41.) The court construes Nichols's brief in support of her Complaint (Doc. No. 15) as a motion for summary judgment and the Commissioner's brief in opposition to the Complaint as a motion for summary judgment (Doc. No. 19).

After careful scrutiny of the record and the motions submitted by the parties, the court recommends that Nichols's motion for summary judgment (Doc. No. 15) is due to be granted, the Commissioner's motion for summary judgment (Doc. No. 19) is due to be denied, and the decision of the Commissioner is due to be reversed and remanded.

---

[1] Document numbers as they appear on the docket sheet are designated as "Doc. No."

## I.    PROCEDURAL HISTORY

Nichols was 54 years, two months, and twenty-four days old when she allegedly became disabled on May 26, 2018, and 56 years old on March 26, 2020, the date of the decision of the Administrative Law Judge ("ALJ"). (R. 36-45, 177.)[2] Nichols has a master's degree in elementary education and has past relevant work as an elementary school teacher. (R. 62, 90.) She alleges that she is unable to work due to arthritis and degenerative joint disease in her hands, knees, left shoulder, elbow, and cervical spine; a back issue; carpal tunnel syndrome (CTS); gastroesophageal reflux disease (GERD); and neuropathy. (R. 38-39, 208.)

On July 11, 2018, Nichols protectively filed a Title II application for a period of disability and DIB under Title II (42 U.S.C. §§ 401, *et seq.*). (R. 177.) This application was denied, and Nichols requested an administrative hearing. (R. 117.) Following the administrative hearing, the ALJ returned an unfavorable decision on March 26, 2020. (R. 36-45.) Nichols sought review by the Appeals Council, and it denied her request. (R. 1-4.) Thus, the hearing decision became the final decision of the Commissioner.[3]

On December 21, 2020, Nichols filed this civil action for judicial review of the Commissioner's final decision. (Doc. No. 1.) The parties have briefed their respective positions. (Docs. No. 15, 19.) This matter is ripe for review.

---

[2] Citations to the administrative record are consistent with the transcript of administrative proceedings filed in this case. (*See* Doc. No. 16.)

[3] "When, as in this case, the ALJ denies benefits and the [Appeals Council] denies review, [the court] review[s] the ALJ's decision as the Commissioner's final decision." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citation omitted).

## II.   FACTS

Nichols is a former elementary education teacher who taught school for thirty-two years, thirty-one of those years as a fourth-grade teacher. (R. 63, 216.) In August 2017, she visited Dr. Vernisha Hill Graham at Family Care Associates, P.C., for an annual exam and complaints of tingling in her fingers on her right hand and a feeling of fluid in her right ear. (R. 314.) Dr. Graham noted that Nichols "does not have any past medical problems," that she had not seen Nichols "in a few years," and that Nichols reported "she ha[d] been relatively healthy which … is why she ha[d] not been in." (*Id*.) Nichols reported no joint pain, back pain, or muscle pain. (R. 315.) Dr. Graham noted that, upon physical examination of the musculoskeletal system, Nichols had "[n]ormal range of motion, [n]ormal strength, [and n]ormal gait." (*Id*.) Nichols reported that the numbness and tingling in her "right fingers and hands" worsened when she slept. (R. 314.) Dr. Graham noted that Nichols was "a school teacher and does a good bit of writing." (*Id*.) Dr. Graham provided samples of Dymista and "[c]arpal tunnel brace for parasthesias." (R. 316.)

On November 9, 2017, Nichols returned to Family Care Associates with complaints of pain in her left knee and leg due to a fall that occurred approximately one week earlier. (R. 318.) Nichols reported that her knee hurt when she walked. Certified Nurse Practitioner ("CRNP") Sonya Tatum examined Nichols and noted that she had left knee pain, no back pain, no neck pain, no myalgia, and normal range of motion, strength, and gait. (R. 319-20.) CRNP Tatum assessed contusion of the left knee, provided samples of Duexis and Pennsaid, and instructed Nichols to alternate heat and ice on the knee. (R. 320.)

On November 29, 2017, Nichols returned to CRNP Tatum at Family Care Associates, where she reported ongoing pain and swelling in her left knee. (R. 321.) Nichols reported that, though after the fall her knee only initially hurt without bruising or swelling, it now was painful and swollen "by the end of the day … after being up on it all day." (*Id.*) CRNP Tatum noted edema in the left knee, but normal range of motion, strength, and gait. (R. 322.) CRNP Tatum assessed bursitis of the left knee and referred Nichols to Southern Orthopedic Surgeons "since NSAIDs, rest[,] and ice hasn't really resolved it." (R. 323.)

The same day, November 29, 2017, Nichols saw Dr. Rolan Hester at Southern Orthopedic Surgeons. (R. 307.) Dr. Hester noted that "[r]adiographs show a very arthritic knee, and quite arthritic for a 53 year old." (*Id.*) Dr. Hester stated, "[i]t is possible that we could scope her and get it better, but I am worried that this might be an endstage knee." (*Id.*) Dr. Hester injected the knee with Lidocaine and Celestone and instructed Nichols that, if the knee did not get better, she was to return in three weeks. (*Id.*)

On December 7, 2017, Nichols returned to Dr. Graham at Family Care Associates to follow up on her carpal tunnel and left knee pain. (R. 324.) Nichols reported pain in both knees, but more pain in the left knee than the right. (*Id.*) Nichols also reported "some pain, numbness, and weakness in her hands from carpal tunnel and desire[d] some relief." (*Id.*) Dr. Graham noted that Nichols had hand pain, numbness and tingling of the hands, and bilateral knee crepitation. (R. 325.) Dr. Graham assessed parasthesia of skin and left knee pain and recommended that Nichols try carpal tunnel braces. (R. 325-26.)

On December 20, 2017, Nichols returned to Dr. Hester at Southern Orthopaedic Surgeons. (R. 306.) Her left knee was still hurting, and Dr. Hester noted that "she [wa]s quite arthritic." (*Id.*) Dr. Hester scheduled Nichols for an MRI, noting that "it may take a total knee [replacement], but we will see if we can get b[y] with less than that." (*Id.*)

On January 8, 2018, Nichols returned to Dr. Hester for pain in her left knee. (R. 311.) Nichols reported that her left knee had not hurt her until her fall, but her knee pain had become intolerable. (*Id.*) Dr. Hester noted that Nichols's MRI "show[ed] pretty significant arthritis with some full thickness loss particularly medial under the kneecap," as well as a "large meniscal tear." (*Id.*) Dr. Hester recommended that Nichols proceed with a total knee replacement, but Nichols was unable to do so until May because of her job as a teacher. (*Id.*) Accordingly, Dr. Hester and Nichols decided to proceed with a scope of the left knee to treat the meniscal tear and provide some relief. (*Id.*)

On January 29, 2018, Nichols again returned to Dr. Hester to follow up on her left knee; she also complained of some pain in her hips and back. (R. 310.) Dr. Hester noted "slight loss of internal rotation on the right" hip, "not much on the left." (*Id.*) He referred Nichols to physical therapy for "a little back rehab" as well as knee rehab, and he planned to reexamine and X-ray Nichols's right hip if she did not get better. (*Id.*)

On February 7, 2018, Dr. Hester examined Nichols after her left knee scope. (R. 309.) He noted that her right knee was "hurting her more" and planned to X-ray the right knee at Nichols's next visit. (*Id.*) Dr. Hester noted that Nichols had good range of motion, but "pain kind of going up her thigh and hips." (*Id.*) He stated that she had "a little loss of internal rotation" in her hips, but "[h]er range of motion [wa]s actually pretty decent" and

her hip X-rays showed "minimal arthritic change." (*Id.*) Dr. Hester stated, "I am also worried about her back. She has a little back pain. Her [X]-rays were unremarkable there, AP and lateral of the spine." (*Id.*) His treatment plan was "to see what Meloxicam does for all of those things" and to plan to follow up with an X-ray of the right knee in a month. (*Id.*)

On March 12, 2018, Nichols returned to Dr. Hester, for pain in both her right and left knees. (R. 308.) Noting that "she has essentially end stage [degenerative joint disorder] and a place that is bone on bone," Dr. Hester stated, "we will do a total left knee arthroplasty." (*Id.*)

Nichols worked until the end of the school year in May 2018. (R. 62.) After that, she retired "due to health issues." (R. 63-64.)

On June 13, 2018, Nichols returned to Dr. Graham at Family Care Associates to follow up on her arthritis pains. (R. 327.) Her right hand was in a brace. (R. 328.) Dr. Graham noted her complaints as follows:

> This is a 54-year-old female here to follow up on arthritis pains. She has been taking Mobic periodically and this helps. She has it in her knees and has had a scope with ortho. She has been informed that she needs a replacement in both and will have one done this summer. She has noticed pains in her elbows that are worse in the morning and sometimes the right is greater than the left. She has not had relief with her regimen for now. She has noticed some burning in her throat after she took Advil. She does notice this periodically and not been able to associate it with anything in particular. She has had some lower back pain and paresthesia of her feet and toes.

(R. 327.)

On examination, Dr. Graham noted that Nichols had normal range of motion, normal strength, and normal gait. (R. 328.) The pain in her elbows was "not reproducible"

and there was [n]o tenderness to palpation of the elbows." (*Id*.) Dr. Graham assessed carpal tunnel syndrome, joint pain, skin parasthesia, and gastro-esophogeal reflux disease. (R. 329.) He prescribed Medrol and omeprazole. (*Id*.)

On July 10, 2018, Nichols underwent a bone density test, which revealed normal bone density. (R. 347.)

On July 16, 2018, Nichols returned to Dr. Hester at Southern Orthopaedic Surgeons complaining of pain in her left knee and numbness in her right hand. (R. 359.) Dr. Hester noted that Nichols wanted to "get [her left] knee fixed." (*Id*.) He further noted:

> The right hand is going numb on her. She has a splint already. She gets numb in the radial three fingers. We will put her on B6. I did not put her through a real heavy exam on this. She wants to get the knee taken care of first. We will proceed with operative intervention.

(*Id*.)

On December 18, 2018, Nichols reported to Baptist Medical Center South for Dr. Hester to perform the left total knee arthroplasty. (R. 372-75.) Dr. Hester listed his diagnosis as "DJD of the knee on the left" and secondary diagnoses of dizziness, degenerative joint disease, gastroesophageal reflux disease, history of TIA and stroke,[4] low back pain, right carpal tunnel, and stress headaches. (R. 372.)

On December 20, 2018, after Nichols's left knee replacement, Carri Carpenter, a physical therapist, conducted an evaluation and created a treatment plan. (R. 452-458.) Carpenter noted that Nichols's functional limitations included limitations in self-care (sleeping, dressing, bathing, housework, and driving), changing and maintaining body

---

[4] Nichols does not allege disability related to her history of TIA and stroke.

position (transfers, sleeping, lying on left side), and mobility (walking and moving around, use of an assistive device, transfers, gait, stairs, and squatting). (R. 454.)

On January 9, 2019, Nichols was seen by Dr. Hester, who noted that her left knee "look[ed] much better." (R. 391.) Dr. Hester also noted that Nichols was "having some pain in the buttock going down her back" and "had back problems in the past," so he "put her on a therapy program for that as well." (*Id.*)

Nichols continued to undergo physical therapy regularly through March 1, 2019; beginning January 9, 2019, physical therapy for the lumbar spine was added. (R. 400, 440.) At her March 1, 2019 discharge from physical therapy, Carpenter noted that her functional limitations included self-care (housework, driving) and mobility (walking and moving around: specifically, gait, stairs, and squatting). (R. 400.) Complicating factors included multiple treatment areas. Carpenter noted that Nichols's gait was antalgic, lacking full knee extension at heel strike, and lacking proper heel strike/toe off (mild). (*Id.*) She also noted mild edema in the left knee. (*Id.*) Carpenter noted that Nichols had "progressed well," her strength has "progressed well," and she was "able to report only mild pain with most" activities of daily living. (*Id.*) Carpenter listed Nichols's problems as pain in the left knee, weakness in the left knee, decreased range of movement in the left knee, and pain in the lumbar spine radicular in the left lower extremity. (R. 400-403.)

On February 13, 2019,[5] Dr. Oluyinka Adediji conducted a comprehensive musculoskeletal examination, which the Department of Disability Services scheduled.[6] (R. 393.) Dr. Adediji assessed Nichols as having chronic back pain – discogenic; bilateral knee pain; bilateral wrist and finger pain; and bilateral hand pain and numbness: carpal tunnel syndrome (greater in the right hand than in the left). (R. 398.) Dr. Adediji noted that pain was Nichols's main limiting factor and further stated:

> Physically, [Nichols] is expected to tolerate [a] sitting job with additional knee and back protective restrictions. (Occasional lifting up to 10 pounds, mainly sitting, brief walking or standing periods, and frequent light handling, fingering[,] and desk level arms extension.)

(*Id.*)

Also on February 13, 2019, Dr. Robert Heilpern reviewed Nichols's medical records to complete a residual functional capacity assessment for the period between May 26, 2018 through December 17, 2019. (R. 103-109.) Dr. Heilpern found that Nichols could occasionally lift or carry 20 pounds and frequently lift 10 pounds. (R. 104.) He also found that she could stand and/or walk about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. (R. 104.) He noted that Dr. Adediji's opinion was more restrictive than his. (R. 107.) Dr. Heilpern explained that, while Dr. Adediji's opinion was currently supported, he did not find Dr. Adediji's opinion

---

[5] Dr. Adediji dated his report February 13, 2014, but, at the hearing, it was agreed that this was a typographical error and that the report should properly have been dated February 13, 2019. (R. 17-18, 393.)

[6] At the hearing before the ALJ, in response to questioning by the ALJ, Nichols stated that the stretching and bending activities required of her at Dr. Adediji's consultative examination caused her increased pain after the examination. (R. 88.)

persuasive because Nichols "has recently had knee replacement; however, it is expected that [Nichols] will continue to improve[] and will not be as limited as [Dr. Adediji] suggests w/in 12 months." (R. 107.) Based on the residual functional capacity ("RFC") assessed by Dr. Heilpern, the disability adjudicator found that Nichols was not disabled because she could perform her past relevant work as a teacher. (R. 108-09.)

On March 3, 2019, Nichols again saw Dr. Hester, "two and [a] half months out from her total knee" replacement. (R. 508.) Dr. Hester made the following notes:

> She is still stiff. She gets to 107 on her own but in the office today she is only about 90. She is not warmed up though. Extension is good. She has a little carpal tunnel. She has splints. She is on B6. X-rays AP lateral left knee today look solid. I will see her in a month for clinical exam of the knee. If she is not getting her motion in the next week or two I want her to call me and we will probably consider manipulation on the left. If she is getting to 107-110 we would probably leave her alone.

(*Id.*)

On April 1, 2019, Nichols returned to Dr. Hester, who made the following notes regarding her left knee and right carpal tunnel:

> Range of motion of the knee today is actually pretty good.
>
> Full extension, flexes up to at least 110. Still puffy but not bad.
>
> The big problem now is numbness in the hand. She has worn splints and has not gotten well.
>
> She has a negative [T]inels and positive [P]halens on right. She has worn the splints. We will get a nerve test and see her after that.
>
> For the back issue we will send her to Dr. Pirofsky for that.

(R. 506-07.)

On April 3, 2019, Nichols returned to Family Care Associates, where she was seen by CRNP Sarah Kondrak for complaints of arthritic pains and a feeling of fullness in her right ear. (R. 476.) CRNP Kondrak assessed osteoarthritis, right upper limb carpal tunnel syndrome, gastroesophageal reflux disease, and allergic rhinitis. (R. 478.)

On May 2, 2019, Dr. Hester evaluated Nichols again and made the following notes:

> Nichols comes back. The knee still has fairly poor motion but she is okay with it. She is not hurting in the knee. The back hurts a little bit. This is the left knee total knee. The hands are still a problem. Not a big Tinel or Phalen. Nerve conduction was borderline for carpal tunnel. There is some concern that if we fix her she may not get well. I am going to try injecting her with Lidocaine and Celestone. See what that does. Under ultrasound guidance, we did a right carpal tunnel. I will see her back if that doesn't take care of it. If it works and then comes [sic] we will fix her.

(R. 505.)

On May 7, 2019, Nichols returned to CRNP Kondrak with "complaints of reflux that has progressively gotten worse over the past several weeks." (R. 480.) Medication and avoiding certain foods were prescribed. (R. 482.)

On May 22, 2019, Nichols returned to CRNP Novak for a two-week follow up for her complaints of acid reflux. (R. 484.) She reported that the prescribed medication and changes to her diet provided no relief or improvement for her acid reflux. (*Id.*) Nichols mentioned that she was scheduled to see a neurosurgeon in June 2019 for evaluation of her back pain. (*Id.*) CRNP Novak prescribed a different medication, noting that if the new medication did not work, "we may need" an esophagogastroduodenoscopy. (R. 486.)

On June 26, 2019, Nichols was seen by Dr. Jeffrey Pirofsky at UAB Medicine Neurosurgery for complaints of "excruciating" (9/10) dull, burning, and stabbing pain,

numbness, and weakness in her cervical and lumbar spine, both arms, and both legs. (R. 469.) Nichols reported that the pain was increased with all positions and better with medication. (R. 476.) She reported no significant improvement from physical therapy and felt that her symptoms including function were worsening; she asked about a lumbar brace to help with her symptoms. (*Id.*) Dr. Pirofsky noted that Nichols could heel and toe walk without difficulty and that her gait was nonantalgic; however, he also noted that her cervical, thoracic, and lumbar range of motion was decreased 30% and that her bilateral hip range of motion was decreased 30%. (R. 471.)

Dr. Pirofsky performed X-rays of Nichols's cervical and lumbar spine and pelvis. The X-ray findings were as follows:

> AP pelvis x-ray reveals hip joint degeneration bilaterally. AP view of the cervical spine reveals no acute misalignment. There is a slight cervical thoracic scoliosis. Flexion and extension views of the cervical spine reveal multilevel disc degeneration and spondylosis without acute instability. AP view [of] the lumbar spine reveals a thoracolumbar scoliosis with multilevel disc degeneration and spondylosis. Flexion-extension views reveal multilevel disc degeneration and spondylosis. There is anterior movement of L5 over S1. Disc degeneration is most significant L5-S1.

(R. 470-71.)

Dr. Pirofsky assessed that Nichols had the following problems: neck pain, low back pain, cervical spondylosis with radiculopathy, other spondylosis with radiculopathy (lumbar region), degeneration of cervical intervertebral disc, degeneration of lumbar intervertebral disc, spondylolisthesis of lumbar region, and chronic pain syndrome. (R. 471-73.) He summarized the next step in the treatment plan as follows:

> To get a better understanding of what is going on in light of the chronic nature of her symptoms and minimal improvement despite time, medication and

physical therapy [an] MRI scan of the cervical and lumbar spine will be recommended.

(R. 474.)

A July 8, 2019 MRI report noted Nichols's history of worsening neck pain over the past year and her bilateral shoulder pain radiating down the arms with tingling and numbness. (R. 467.) The MRI of Nichols's cervical spine revealed the following findings:

Cervical alignment is satisfactory. Vertebral body heights are maintained. Multilevel disc desiccation. No abnormal marrow signal. Subtly increased cord signal at C3-C4. Included soft tissues normal. The following level by level abnormalities are noted[:]

C2-C3: Negative

C3-C4: There is a central disc herniation effacing the thecal sac and indenting the cord. Subtly increased cord signal may be spondylitic myelopathy. Moderate right neural foraminal stenosis. Mild left neural foraminal stenosis.

C4-C5: Central disc herniation indenting the thecal sac. No abnormal cord signal. There is moderate bilateral neural foraminal stenosis.

C5-C6: Disc desiccation with broad disc osteophyte complex effacing the thecal sac and flattening the cord. Moderate neural foraminal stenosis.

C6-C7: Disc desiccation with a mild disc osteophyte complex more prominent to the right of midline, this effaces the thecal sac and contacts but does not compress the cord. Mild bilateral neural foraminal stenosis.

C7-T1: negative.

IMPRESSION:

Extensive multilevel cervical spondylosis with significant central stenosis and cord impingement at C3-C6.

(R. 467-68.)

On July 9, 2019, Nichols returned to Dr. Graham at Family Care Associates with complaints that her GERD was getting worse. (R. 487.) Although Dr. Graham noted no joint, back, or muscle pain in her list of the review of systems, she also noted that Nichols "had been seeing ortho and a neurosurgeon for pain in her neck and back that radiates to her arms and legs." (R. 487-88.) Dr. Graham's diagnoses included generalized osteoarthritis and epigastric pain. (R. 489.)

On July 25, 2019, Nichols saw Dr. Pirofsky at UAB Medicine Neurosurgery for "[f]ollow-up for chronic neck and low back pain with radiation of pain, numbness and weakness bilateral arms and legs." (R. 463.) The pain was described as "severe-excruciating 8/10" compared to her prior visit, where it had been rated "excruciating 9/10." (*Id*.) Dr. Pirofsky again noted 30% decreases in range of motion in cervical, thoracic, and lumbar spine and in both hips. (R. 464.) Dr. Pirofsky noted the MRIs of Nichols's cervical and lumbar spine revealed the following:

> [M]ultilevel disc degeneration with subtle increased cord signal at C3-C4. There is no acute abnormality C2-C3 with a central disc herniation at C3-C4 effacing the thecal sac and indenting the cord. There is moderated right and mild left-sided narrowing. At C4-C5 there is a central disc herniation with moderate bilateral narrowing and no cord signal abnormality. At C5-C6 there is disc degeneration with a disc osteophyte complex causing thecal sac effacement and cord flattening with moderate bilateral narrowing. At C6-C7 there is a disc osteophyte complex more prominent to the right effacing the thecal sac with mild bilateral narrowing in no acute abnormality C7-T1. In the lumbar spine there is no acute abnormality L1-L3 with disc bulge and mild thecal sac narrowing with moderate bilateral narrowing L3-L4. At L4-L5 there is mild/moderate central narrowing secondary to facet arthropathy and disc bulge with mild/moderate bilateral narrowing. There is a grade I spondylolisthesis at L5-S1 with moderately severe bilateral narrowing secondary to disc bulge and facet spondylosis. Mild thecal sac stenosis was also noted.

(R. 464-65.)

Dr. Pirofsky assessed Nichols as having the following issues: cervical spinal stenosis, lumbar canal stenosis, protrusion of cervical intervertebral disc, protrusion of lumbar intervertebral disc, spondyloslisthesis of lumbar region, cervical spondylosis with radiculopathy, degeneration of lumbar intervertebral disc, degeneration of cervical intervertebral disc, neck pain, chronic neck pain, chronic pain syndrome, and other spondylosis with radiculopathy, lumbar region. (R. 464-66.) Dr. Pirofsky's summary of the plan for the next step in treatment was as follows

> Surgical consultation was discussed especially with cord changes noted in the cervical spine versus spinal injection and pain management. She wishes to proceed with surgical consultation since she is not interested in spinal injections at this point in time. If she is not a surgical candidate or does not want to proceed with surgery[,] I would be happy to see her again.

(R. 466.)

On July 29, 2019, Nichols saw CRNP Ashley Powell at UAB Medicine Neurosurgery for her back and neck pain. CRNP Powell described Nichols's complaints as follows:

> Nichols is a 55 yobf referred to our clinic by Dr. Pirofsky for the above complaints. She has had progressively worsening neck pain over the past 4 years. She describes a nearly constant neck pain with radiation across the tops of the shoulders, worsened with all activity. There is frequent throbbing of the bicep muscles. She describes a constant numbness and tingling of the right hand, however she has known carpal tunnel syndrome that is stable. There is no numbness and tingling anywhere else. She does feel her gait is somehow different, however she attributes that to her back pain. She takes Mobic and oxycodone with significant improvement in her symptoms. She rates her current pain 8/10.
>
> In regards to her back, she has suffered on and off for many years. She describes a constant stiffness, worse in the mornings and when standing from

a seated position[]. She occasionally has throbbing pain down the back of the legs, extending to the ankles, left more so than right. She did complete physical therapy with moderate improvement in her symptoms. She has not completed lumbar injections. She gets moderate relief with Mobic and oxycodone. She rates her current pain 8/10.

(R. 460.)

CRNP Powell noted that Nichols "walks independently" with a "normal gait," but had "[m]ildly limited cervical and lumbar ROM in all planes." (R. 461.) For cervical spinal stenosis, CRNP Powell described the following treatment plan:

We discussed the options. I think she is in the beginning stages of myelopathy. We have recommended [anterior cervical discectomy and fusion ("ACDF")] C3-6. She is aware to stop her Mobic and all NSAIDs 10 days prior to surgery. She will schedule at her convenience.

(*Id*.)

For lumbar spinal pain, CRNP Powell recommended lumbar spine injections, which Nichols declined. (*Id*.)

On August 15, 2019, Nichols again consulted Dr. Hester for neck and shoulder issues. (R. 504.) Dr. Hester made the following notes of the visit:

Nichols comes in. The shot did help her hand for a while but it has come back. She is also having some neck issues.

I looked at her MRI. She does have multi-level neck issues, having pain in the shoulder as well.

She is trying to make a decision where to go. The hand obviously would be to fix the carpal tunnel with borderline nerve test, see if that gets rid of the pain. It would not give her relief of the pain if it is neck. Other option would be to fix the neck first and then do what is left, see if that helps the hand enough. The shoulder is also hurting her particularly the left. She has pain with elevation, isolation of supraspinatus, no warmth or erythema, not much of a biceps lift.

16

No skin lesions. It is not super impressive but it hurts. It hurts to lay on it and moves certain ways. The pattern is not totally consistent with neck though it is somewhat.

I think because she has to decide the next few weeks on neck surgery we need to see if the shoulder has pathology to help her make the decision. Normally we would do injections and therapy. I think in this case we need an answer sooner. We will get a gad MRI of the left shoulder looking at the cuff. We will get her back as quick as we can after that.

(*Id.*)

On August 20, 2019, Nichols underwent an MRI of her left shoulder, which revealed a rotator cuff tear and mild bursitis. (R. 502-503.) Dr. Hester described the tear as "high grade partial or small complete." (R. 502.) He noted that Nichols had "pain with elevation, pain with isolation of supraspinatus." (*Id.*) He further stated that Nichols "understands she has neck issues and maybe hand issues but the shoulder is the biggest things. She wants to get this fixed. She understands it will only fix the shoulder pain." (*Id.*) Dr. Hester added that he did not "think we would have to do anything with the biceps; if we do[, Nichols] wants tenodesis rather than tenotomy." (R. 501.)

Dr. Hester filled out a work excuse for Nichols stating that she was not to work from September 19, 2019 through September 30, 2019 due to her left shoulder. (R. 499.) The work excuse lists no place of employment, and it is not entirely clear from the record why Dr. Hester filled out this work excuse, though it appears that the order not to work during those dates was due to her rotator cuff or to anticipated rotator cuff repair surgery. (R. 500.)

On October 8, 2019, Nichols returned to Dr. Graham at Family Care Associates for a three-month follow up, where she mentioned her shoulder and right knee pain and her carpal tunnel. (R. 490.) Dr. Graham states that Nichols "has been followed by ortho and I

have not had much insight." (*Id.*) Nichols stated that "her symptoms are preventing her from moving around with her children at school" and that she "wants disability." (*Id.*) Dr. Graham noted no back or muscle pain, but did note that Nichols had joint and neck pain. (R. 491.) Dr. Graham noted that Nichols had normal range of motion, normal strength, and normal gait, although Nichols's right knee had "mild edema medially." (R. 492.) Dr. Graham assessed osteoarthritis and carpal tunnel syndrome. (*Id.*)

On October 24, 2019, Nichols saw Dr. Hester for a complaint of right knee pain because "she kind of hit it." (R. 497.) Physical examination of the right knee revealed "pain in the medial joint, pain with flexion and pain with McMurray" as well as effusion. (*Id.*) X-rays showed "moderately severe [degenerative joint disease]. Not real far from needing joint replacement." (*Id.*) Dr. Hester noted that Nichols was scheduled "to have her shoulder done on 11/07/2019." (*Id.*) Dr. Hester noted the following assessment and plan:

> We went over the options with her. She is doing anti-inflammatories and meloxicam already. I am going to inject her with Lidocaine and Celestone. If that does not do it, we will go further, but we need to get her shoulder taken care of first. This is the right knee.

(*Id.*) Dr. Hester performed the knee injection procedure in his office on October 24, 2019. (*Id.*)

On December 23, 2019, Nichols returned to Dr. Hester for treatment of her right knee pain. (R. 495.) Dr. Hester noted "medial joint line tenderness," but "good stability and good range of motion." (*Id.*) He drained the knee and injected it with Synvisc; he stated that, "[i]f this does not do it then we will have to talk about surgical intervention." (*Id.*)

On February 5, 2020, Nichols was admitted to Baptist Health Neurosurgery where she saw CRNP Powell for reevaluation. (R. 511-13.) CRNP Powell noted that Nichols had a lower back brace. (R. 511.) Nichols complained of neck pain, left shoulder pain, and right forearm numbness. (*Id*.) She also complained of "difficulties with fine motor movements such as buttoning buttons and clasping jewelry." (*Id*.) She reported that "[t]he pain and arm symptoms are worse with all activities and relieved with meloxicam." (*Id*.) She rated her pain as 8/10. Nichols also complained of lower back pain, describing "a constant dullness over her lower back that worsens when she stands. At that point there is a shooting sensation down the back of her legs to her knees." (*Id*.) Nichols reported that "[t]he pain is worsened with walking for extended periods" and "improved with meloxicam." (*Id*.) She rated her current lumbar pain at 8/10. (*Id*.)

On physical exam, Nichols was found to "walk[] independently" with a "mild left limp." (R. 512.) She had "[m]inimal tenderness to palpitation," and "cervical and lumbar [range of motion were] limited in all planes due to pain." (*Id*.) Her neurologic exam revealed that she was

> [a]wake, alert, and appropriate…. Moves all extremities equally. Strength 5/5 throughout. Decreased sensation to light touch of right forearm and right hand. Positive Tinels and Phalen's on the right… Hoffman's noted bilaterally, right more than left. She is unable to tandem gait.

(*Id*.)

CRNP Powell provided the following assessment and plan:

> 1. Cervical myelopathy. Unfortunately, her most recent cervical MRI is from July 2019. She will likely need an anterior cervical discectomy and fusion, C3-C6 with Medtronic. We will obtain another cervical MRI to assess the

degenerative disk herniation at C6-7. We have provided her soft collar for support today. She will follow up with us after her cervical MRI.

2. Spondylolisthesis, lumbar region. We will obtain lumbar flexion/extension films in our office at the next visit.

3. Carpal tunnel syndrome, right. I have encouraged her to get the results of her electrical studies and bring them to our office at her next follow-up appointment.

(R. 512-13.)

On or about February 7, 2020, Dr. Hester approved a temporary handicap parking application for Nichols from February 5, 2020 through August 5, 2020. (R. 517.) The reasons for the permit were listed as "cannot walk without the use of, or assistance from, a brace, cane, crutch, another person, prosthetic device, wheelchair, or other assistive device," and "[is] severely limited in [her] ability to walk due to an arthritic, neurological, or orthopedic condition." (R. 517.)

## II.   STANDARD OF REVIEW

Judicial review of disability claims is limited to whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). "The Commissioner's factual findings are conclusive" when "supported by substantial evidence." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). "Substantial evidence" is more than a mere scintilla and is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1346, 1349 (11th Cir. 1997)). Even if the Commissioner's decision is not supported by a preponderance of the

evidence, the findings must be affirmed if they are supported by substantial evidence. *Id.* at 1158-59; *see also Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not find new facts, reweigh evidence, or substitute its own judgment for that of the Commissioner. *Bailey v. Soc. Sec. Admin., Comm'r*, 791 F. App'x 136, 139 (11th Cir. 2019); *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004); *Dyer*, 395 F.3d at 1210. However, the Commissioner's conclusions of law are not entitled to the same deference as findings of fact and are reviewed *de novo. Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

Sentence four of 42 U.S.C. § 405(g) authorizes the district court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court may remand a case to the Commissioner for a rehearing if the court finds "either . . . the decision is not supported by substantial evidence, or . . . the Commissioner or the ALJ incorrectly applied the law relevant to the disability claim." *Jackson v. Chater*, 99 F.3d 1086, 1092 (11th Cir. 1996).

### III.   STANDARD FOR DETERMINING DISABILITY

An individual who files an application for Social Security DIB must prove that she is disabled. *See* 20 C.F.R. § 404.1505. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

Disability under the Act is determined under a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. The evaluation is made at the hearing conducted by an administrative law judge ("ALJ"). *See Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial gainful activity" is work activity that involves significant physical or mental activities. 20 C.F.R. § 404.1572(a). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of impairments that significantly limit the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. If such criteria are met, then the claimant is declared disabled. 20 C.F.R. § 404.1520(d).

If the claimant has failed to establish that she is disabled at the third step, the ALJ may still find disability under the next two steps of the analysis. At the fourth step, the ALJ must determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). The ALJ must determine whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(f). If it is determined that the claimant is capable of performing past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1560(b)(3). If the ALJ finds that the claimant is unable to perform past relevant work, then the analysis proceeds to the fifth

and final step. 20 C.F.R. § 404.1520(g)(1). In this final analytical step, the ALJ must decide whether the claimant is able to perform any other relevant work corresponding with her RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c). Here, the burden of proof shifts from the claimant to the ALJ in proving the existence of a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

## IV.   ADMINISTRATIVE DECISION

Within the structure of the sequential evaluation process, the ALJ found that Nichols met the insured status requirements of the Social Security Act through December 31, 2023, but had not engaged in substantial gainful activity since the alleged onset date. (R. 38.) The ALJ determined that Nichols suffers from the following severe impairments that significantly limit her ability to perform basic work activities: general arthritis and degenerative joint disease of the knees, bilaterally, left shoulder, and cervical spine. (R. 38.) The ALJ did not find carpal tunnel to be a severe impairment. (R. 39.)

The ALJ concluded that Nichols's physical impairments do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 39.)

After consideration of the record, the ALJ determined Nichols retained the RFC

to perform light work as defined in 20 [C.F.R.] 404.1567(b), lifting and carrying 20 pounds occasionally and 10 pounds frequently; she can sit, stand[,] and walk six of 8 hours each for a full 8 hour day; she has unlimited push/pull and gross/fine dexterity except for occasional push and pull with the bilateral, lower extremities and frequent hand use, bilaterally. She can climb ramps and stairs occasionally but no ladders, ropes, or scaffolds and she can never run. She can occasionally bend, stoop, crouch, balance, and

twist but not crawl or squat. She can have no exposure to heights, dangerous machinery, or uneven surfaces. There is no mental impairment.

(R. 39-40.)

In assigning this RFC, the ALJ found Nichols's statements about the intensity, persistence, and limiting effects of her symptoms could reasonably be expected to cause Nichols's alleged symptoms of being unable to stand or walk each for six hours in an eight-hour day, or of being unable to lift more than 10 pounds. (R. 42, 78-79.) However, the ALJ found that "the claimant's statements concerning the alleged symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" in the ALJ's opinion. (R. 42.) In support of the RFC finding, the ALJ cited items from the medical records as well as statements the ALJ attributed to Nichols. (R. 42-44.) The ALJ found that Dr. Heilpern's February 13, 2019 opinion that Nichols could lift and carry 20 pounds occasionally and 10 pounds frequently, and that she could stand and walk for about six hours in an eight-hour workday, to be consistent with the medical evidence and with the record as a whole, and, therefore, persuasive. (R. 43-44.) The ALJ found that Dr. Adediji's February 13, 2019 opinion that Nichols was limited to "occasionally lifting up to 10 pounds, mainly sitting, [with] brief walking or standing periods" was not persuasive on grounds that it was not consistent with the record as a whole, with Dr. Adediji's findings, and with Dr. Heilpern's opinion. (R. 44.)

Relying on the VE's testimony regarding Nichols's ability to engage in her past work as an elementary school teacher while having the RFC assigned by the ALJ, the ALJ found that Nichols could perform her past relevant work. (R. 44-45.) Accordingly, the ALJ

found that Nichols was "not disabled under sections 216(i) and 223(d) of the Social Security Act" from the May 26, 2018 alleged date of onset through the date of the ALJ's March 26, 2020 decision. (R. 45.)

## V.   DISCUSSION

A. Issues

On appeal, Nichols presents four issues:

1.     Whether the ALJ erred in his evaluation of Nichols's statements regarding the nature and limiting effects of her symptoms;

2.     Whether the ALJ erred in finding that Nichols retained the ability to perform light work activity;

3.     Whether the ALJ erred in finding that Nichols retained the RFC to return to her past relevant work as an elementary school teacher; and

4.     Whether the ALJ erred in failing to find that an individual with Nichols's vocational profile, unable to perform past work and limited to a full range of light work, would be found disabled under Medical Vocational Rule 202.06, as of her 55th birthday.

For the reasons explained below, the court finds that the case is due to be remanded because the ALJ erred in his evaluation of Nichols's statements regarding the nature and limiting effects of her symptoms. Accordingly, the court pretermits discussion of the remaining issues Nichols presents.

B. The ALJ Erred in his Evaluation of Nichols's Statements Regarding the Nature and
Limiting Effects of Her Symptoms

In *Holt v. Sullivan*, 921 F.2d 1221 (11th Cir. 1991), the Eleventh Circuit "articulated

the 'pain standard,' which applies when a disability claimant attempts to establish a

disability through his own testimony of pain or other subjective symptoms." *Dyer v.*

*Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam). "The pain standard requires

'(1) evidence of an underlying medical condition and either (2) objective medical evidence

that confirms the severity of the alleged pain arising from that condition or (3) that the

objectively determined medical condition is of such a severity that it can be reasonably

expected to give rise to the alleged pain.' " *Id.* (quoting *Holt*, 921 F.2d at 1223). If the ALJ

discredits a claimant's subjective testimony, he "must articulate explicit and adequate

reasons for doing so or the record must be obvious" as to the finding. *Strickland v. Comm'r*

*of Soc. Sec.*, 516 F. App'x 829, 832 (11th Cir. 2013) (per curiam) (citing *Foote v. Chater*,

67 F.3d 1553, 1561-62 (11th Cir. 1995)). Failure to articulate the reasons for discrediting

testimony related to pain or other subjective symptoms requires, as a matter of law, that

the testimony be accepted as true. *Holt*, 921 F.2d at 1223. On the other hand, when the

ALJ's reasons for discrediting a claimant's statements about pain or other symptoms are

clearly articulated and supported by substantial evidence in the record, a reviewing court

will not disturb the ALJ's findings. *Foote*, 67 F.3d at 1562.

Social Security Ruling ("SSR") 16-3p "provides guidance about how [the Social

Security Administration] evaluate[s] statements regarding the intensity, persistence, and

limiting effects of symptoms in disability claims. . . ." Soc. Sec. Ruling 16-3p, 82 Fed. Reg.

49462-03, 2017 WL 5180304 (Oct. 25, 2017). Notably, "SSR 16-3p provides clarification of the subjective pain standard; it does not substantively change the standard" or "the factors that an ALJ should consider when examining subjective pain testimony." *Harris v. Berryhill*, Case No.: 5:16-CV-01050-MHH, 2017 WL 4222611, at *3 n.2 (N.D. Ala. Sept. 22, 2017) (internal citation omitted); *see also Griffin v. Berryhill*, No. 4:15-cv-0974-JEO, 2017 WL 1164889, at *6 n.10 (N.D. Ala. March 29, 2017) ("The Eleventh Circuit's pain standard is consistent with the parameters that SSR 16-3p sets forth.").

The new ruling eliminates the use of the term "credibility" from the sub-regulatory policy and stresses that the ALJ "will not assess an individual's overall character or truthfulness" but instead will "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the [ALJ's] evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities . . . ." SSR 16-3p, 82 Fed. Reg. 49462-03 at 49463, 49467. "Whether before or after SSR 16–3p, an ALJ may choose to discredit a claimant's testimony about his or her symptoms." *Ring v. Berryhill*, 241 F. Supp. 3d 1235, 1252 (N.D. Ala. 2017), *aff'd sub nom. Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966 (11th Cir. 2018) (per curiam).

When evaluating a claimant's symptoms, a two-step process must be used. *Contreras-Zambrano v. Soc. Sec. Admin., Comm'r*, 724 F. App'x 700, 703 (11th Cir. 2018) (per curiam) (citing SSR 16-3p, 82 Fed. Reg. 49462-03 at 49463). At step one, the ALJ must determine whether the claimant has a medically determinable impairment that could

reasonably be expected to produce the alleged symptoms. SSR 16-3p, 82 Fed. Reg. 49462-03 at 49463-64. At step two, the ALJ must evaluate the intensity and persistence of the symptoms and determine the extent to which they limit the claimant's ability to perform work-related activities. *Id*. at 49464-66. In doing so, the ALJ must examine the entire case record, including the objective medical evidence; the claimant's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the case record. *Id*. at 49464.

The ALJ also must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3), including (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve her pain or symptoms other than treatment; and (7) any other factors concerning the claimant's functional limitations and restrictions due to her pain or symptoms. *Id*. at 49465-66; *see* 20 C.F.R. § 404.1529(c)(3).

The ALJ then must examine the claimant's statements about the intensity, persistence, and limiting effects of symptoms in relation to all other evidence and consider whether they are consistent with the record as a whole. *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1308 (11th Cir. 2018) (per curiam) (citing SSR 16-3p, 81 Fed. Reg. 14166, 14170 (Mar. 16, 2016)); *see also* 20 C.F.R. § 404.1529(c)(4).

 "[T]he ALJ [is not required] to 'specifically refer to every piece of evidence in [the] decision,' so long as the decision is sufficient to allow [the court] to conclude that the ALJ

considered the claimant's medical condition as a whole." *Castel v. Comm'r of Soc. Sec*, 355 F. App'x 260, 263 (11th Cir. 2009) (quoting Dyer, 395 F.3d at 1211). Further, credibility determinations are committed to the ALJ. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *Ybarra v. Comm'r of Soc. Sec. Admin.*, 658 F. App'x 538, 540 (11th Cir. 2016). However, the court's

> limited review does not … mean automatic affirmance, for although we defer to both the Secretary's factfinding and her policy judgments, we must still make certain that she has exercised reasoned decision making. To this end, we evaluate the Secretary's findings in light of the entire record, not only that evidence which supports her position.

*Owens v. Heckler*, 748 F.2d 1511 (11th Cir. 1984).

At the administrative hearing and in paperwork submitted to the Commissioner, Nichols alleged that, due to pain from her combined impairments and pain and numbness in her hands and arms, she could not lift more than ten pounds, she could not sit more than twenty-five minutes without standing, she could not walk more than one hundred to one hundred and fifty feet without assistance, and she could not stand for more than ten minutes. (R. 78-79; 233-240.) The ALJ found Nichols's medical determinable impairments could reasonably be expected to cause her alleged symptoms being unable to lift more than 10 pounds and her stated limitations in her ability to sit, stand, and walk. (R. 42, 78-79.) However, in assigning an RFC that included lifting and carrying twenty pounds occasionally and ten pounds frequently, and that included the limited ability to sit, stand and walk for six hours each during an eight-hour workday, the ALJ found that Nichols's "statements concerning the alleged symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" in the ALJ's opinion.

(R. 42.) Specifically, the ALJ rejected Nichols's subjective statements that, due to pain from her combined impairments, she was limited to lifting not more than ten pounds, stand for ten minutes, and walk limited distances.[7] (R. 78-79, 234.-35, 238-39.)

First, the ALJ stated that, "although [Nichols] alleges significant limitations in her ability to lift, walk, sit, stand, and climb stairs, she states that she is able to take care of her personal needs, care for a child,[8] perform some light household chores, and prepare simple meals daily." (R. 43.) However, Nichols's abilities to care for a child, perform some light household chores, and prepare simple meals do not undermine her testimony of significant limitations in the ability to lift, walk, sit, stand, and climb stairs. Those things are not incompatible. *See Alvarado v. Comm'r of Soc. Sec. Admin.*, No. 3:19-CV-661-J-MCR, 2020 WL 5652297, at *7 (M.D. Fla. Sept. 23, 2020) ("[T]he performance of limited daily activities is not necessarily inconsistent with allegations of disability." (citations omitted)).

Further, the materials cited by the ALJ in support of his characterization of Nichols's activities of daily living – Exhibit 6E (R. 233-40) and Nichols's hearing testimony (R. 60-88) – do not undermine but instead are fully consistent with Nichols's allegations that she had difficulty lifting items over ten pounds and her testimony regarding her limitations in the ability to walk, sit, stand, and climb stairs. Her statements regarding

---

[7] At the hearing, the ALJ asked Nichols how far and how long, to which Nichols replied, "I can walk probably right at a good – I give it about 100 feet and –," after which the ALJ cut her off. (R. 79.) Taken in context, it is clear that Nichols was attempting to state that she had difficulty walking distances longer than one hundred feet, at least without assistance. (R. 79, *see also* R. 239.)

[8] At the February 19, 2020 administrative hearing, Nichols testified that the child was seven years old. (R. 62.)

these activities are fully and completely consistent with her alleged limitations. In Exhibit 6E (R. 233-240), which was a self-reported functional report dated July 28, 2018, Nichols did state that, in her daily activities, she "t[ook] care of personal hygiene (bath, brush hair/teeth)." (R. 233.) However, in describing her personal care limitations, she stated that, in dressing, she had "difficult[y] put[ting] on [her] shoes, socks, [and] stockings due to back and joint pains of the knees and hands." (R. 234.) She stated that, in caring for her hair, it was "difficult to raise [her] arms as well as use [her] hands due to arthritis and carpal tunnel." (*Id.*) She also stated that, "[i]t is difficult to get off the toilet without the use of the toilet safety rails due to joint pain of the knees, back, and hands." (*Id.*) Regarding child care, Nichols stated that she did prepare food for the child and help the child put on clothing and brush hair. (*Id.*) However, she stated that her husband helped with the child by lifting him when needed, bathing him, and transporting him to school. (*Id.*) In her hearing testimony, Nichols stated that her daughters and husband assisted in caring for the child. (R. 81-82.) As for light housework, Nichols stated that her husband lifted objects greater than ten pounds and helped complete the chores; she spent approximately an hour and a half three days a week on "light ironing, laundry, [and] cleaning." (R. 235.) She also stated that she completed her laundry, cooking, and cleaning chores "in stages. Sometimes days before completing." (R. 238.) In Exhibit 6E, Nichols stated that she prepared simple meals daily, such as a sandwich, cereal, or frozen food, and very seldom prepared a full meal due to joint swelling and aching. (R. 235.) She stated that her ability to cook was limited by her impairments, in particular that standing on her feet caused her "feet to tingle, back to hurt, and knees to swell." (R. 235.) She noted that her ability to complete tasks, chores, and

responsibilities at home were affected by her concentration being interrupted by pain, numbness, or stiffness. (R. 240.) Nichols's hearing testimony was consistent with her statements in Exhibit 6E. (R. 78-88). Nowhere in Nichols's hearing testimony or in Exhibit 6E did Nichols make a statement regarding her activities of daily living that was inconsistent with her alleged limitations. The ALJ's implication to the contrary fundamentally mischaracterizes the evidence. Thus, the ALJ did not rely on substantial evidence when he relied on those materials to contradict Nichols's subjective statements of the limiting effects of her impairments.

Accordingly, it was improper for the ALJ to conclude that Nichols's ability to engage in limited activities of daily living undermined her testimony regarding the limiting effects of her impairments, especially the ability to lift, stand, sit, and walk. *Cf. Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1266 (11th Cir. 2019) (holding that, taking care of grooming needs, paying bills, doing very little housework, and minimally cooking simple items like sandwiches and frozen dinners did not constitute a full range of daily activities and did not undermine a finding of severe mental impairment); *Collier v. Saul*, 407 F. Supp. 3d 1201, 1213–14 (N.D. Ala. 2019) ("The claimant's ability to do these daily activities with these limitations does not undermine her subjective statements about her pain. The ALJ cannot simply ignore these limitations and then claim substantial evidence supports his misconstrued conclusion about the claiman's daily activities."); *Cavarra v. Astrue*, 393 F. App'x 612, 614-616 (11th Cir. 2010) (holding that an ALJ erred in relying on the plaintiff's activities of daily living to discredit the claimant's subjective pain testimony where, among other things, those activities were "not comparable to typical work

activities," where the ALJ mischaracterized the evidence about the plaintiff's activities of daily living by ignoring the plaintiff's statements regarding the limitations of his daily activities, and where the ALJ failed to consider the assistance the plaintiff received from others in completing those activities). *Cf. Cates v. Commr of Soc. Sec.*, 752 F. App'x 917, 921 (11th Cir. 2018) (holding that, in discrediting the claimant's subjective allegations of the limiting effects of her pain, the ALJ did not err and did not mischaracterize the record, where (unlike the ALJ in this present case) the ALJ acknowledged and considered the fact that the claimant received help with transportation and caring for a child).

In addition, the ALJ found that "the medical record does not support any functional loss that would prevent [Nichols] from performing her past work as a teacher." (R. 43.) From the VE's response to questioning, it is clear that a person with the RFC assigned by the ALJ (including the ability to lift and carry twenty pounds occasionally and ten pounds frequently and the ability to sit, stand, and walk six of eight hours each for a full eight-hour day) could perform Nichols's past job as an elementary school teacher both as performed and as it is generally performed in the economy. (R. 90-91.) However, an individual with the same RFC but with the additional limitation of being able to stand and walk not more than four hours each of eight hours in a full eight-hour workday would *not* be able to perform Nichols's past work as an elementary teacher. (*Id.*) Alternatively, an individual with the RFC assigned by the ALJ but with the additional limitation of being able to lift no more than ten pounds also would *not* be able to perform Nichols's past work as an elementary teacher. (*Id.*) Accordingly, medical evidence critically relevant to "functional loss that would prevent [Nichols] from performing her past work as a teacher" (R. 43)

would be medical evidence tending to show whether Nichols could stand and walk six hours each out of an eight-hour workday and whether Nichols could lift and carry twenty pounds occasionally.

To suggest that the medical evidence undermines Nichols's statements regarding the limitations of her combined impairments on her ability to lift, stand, and walk, the ALJ commented that Nichols's physical examinations "have generally been unremarkable." (R. 43.) This is a mischaracterization of the medical record. Most of the items specifically listed by the ALJ as "unremarkable" are unrelated to Nichols's impairments and thus would be expected to be both "unremarkable" and irrelevant to her combined impairments' effect on her ability to lift, sit, stand, or walk. (R. 43 (noting such things as normal heart rate and rhythm, equal breath sound, etc.).) Other items the ALJ lists as being "unremarkable" are findings of normal range of motion, normal gait, and normal strength. (R. 43.) However, taken within the context of the medical examinations in which they occurred and in the context of the medical record as a whole, those findings are not inconsistent with Nichols's testimony and statements that she can lift no more than ten pounds due to pain and numbness, nor do those observations undermine her subjective statements regarding how her pain from her combined impairments limits her ability to stand and walk. *See Collier*, 407 F. Supp. 3d at 1214 ("The claimant's ability to exhibit a full range of motion of her extremities, for example, does not discount the pain or numbness she may feel in those extremities."). Further, the ALJ did not articulate why he chose to credit the "normal" examination findings over the many abnormal examination findings, such as instances in which Nichols did *not* have normal gait, strength, or range of motion. "[W]hen the

inaccuracy or mischaracterization [of the record] is the result of an ALJ's failure to acknowledge and discuss material evidence that conflicts with the ALJ's findings, the ALJ commits an error of law as the decision fails to explain the basis for the ALJ's conclusions sufficiently to permit a court to complete a meaningful review on appeal." *Sneed v. Berryhill*, No. 3:15CV591-SRW, 2017 WL 1230849, at *5 (M.D. Ala. Mar. 31, 2017) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

For example, in support of his conclusion that the medical record undermines Nichols's subjective testimony regarding her ability to do her past work, the ALJ cites the fact that, in February and March 2019, Nichols was recovering well from her left knee replacement, that she had only mild deficits in gait, and that her strength and range of motion had improved. (R. 43.) Again, these observations do not provide substantial evidence to undermine her testimony and subjective statements that, due to pain from all her impairments (many of which worsened after her left knee replacement), she cannot lift more than ten pounds and she is limited in her ability walk or stand for more than short periods of time. *See Collier*, 407 F. Supp. 3d at 1214 ("While the ALJ primarily relied on Dr. Livingstone's 'essentially normal' physical examinations of the claimant, he further mischaracterized the evidence by failing to mention other medical evidence that noted her abnormalities.").

The court will not detail every one of the several references that the ALJ made to the medical record in a manner that mischaracterizes the record by depriving those references of context, but two examples will adequately serve as illustrations. First, in the ALJ's opinion, he noted that, "in April 2019, the record indicated that [Nichols's] range of

motion of the knee was 'actually pretty good.'" (R. 43 (citing R. 507)). What the record actually states is that, on April 1, 2019, Dr. Hester noted that "[r]ange of motion of the [left] knee *today* is actually pretty good" (R. 506-507 (emphasis added)), but went on to note that "[t]he big problem now is numbness in the hand. She has worn splints but has not gotten well …. For the back issue we will send her to Dr. Pirofsky for that." (R. 507.) In context, the notation of range of motion in the left knee being "actually pretty good" in no way constitutes substantial evidence to undermine Nichols's subjective statements regarding her ability to return to her past work, *i.e.*, statements regarding limitations on lifting, standing, and walking, due to her symptoms from her combined impairments. Second, the ALJ also listed all of the somewhat normal physical examination observations from Nichols's July 25, 2019 consultation with Dr. Pirofsky for "severe-excruciating" pain in the cervical and lumbar spine and bilateral arms and legs. (R. 43 (citing R. 464).) What the ALJ leaves out are Dr. Pirofsky's abnormal observations (such as 30% decreased range of motion in the cervical, thoracic, and lumbar spine as well as both hips) and the *actual MRI results* substantiating Dr. Pirofsky's diagnoses of cervical spine stenosis, lumbar canal stenosis, protrusion of the cervical invertebral disc, protrusion of the lumbar intervertebral disc, spondylolisthesis of the lumbar region, cervical spondylosis with radiculopathy, degeneration of the intervertebral disc, degeneration of the cervical intervertebral disc, neck pain, other spondylosis with radiculopathy (lumbar region), chronic pain syndrome, and low back pain. (R. 463-66.)

Other examples of similar mischaracterization of the record by decontextualization are available, but it is not necessary to set them out in detail here. The point is that, by

relying on a mischaracterized record, the ALJ did not rely on substantial evidence. *See Sneed*, 2017 WL 1230849, at ** 4-5 ("An ALJ's decision is not based on substantial evidence, and improper legal standards were applied if '[t]he ALJ's inaccuracies and mischaracterizations taint the record.'" (quoting *Webster v. Barnhart*, 343 F. Supp. 2d 1085, 1093 (N.D. Ala. 2004)); *Flentroy-Tennant v. Astrue*, No. 3:07-CV-101-J-TEM, 2008 WL 876961, at *8 (M.D. Fla. Mar. 27, 2008) (holding that, "[w]hile each of the aforementioned misstatements and/or mis-characterizations of the record when viewed individually may not constitute such error as to require reversal, the numerous misstatements mentioned … taken as a whole, reveal an inaccurate review of the record and inadequate support in the record"); *see also Baker v. Colvin*, 2013 WL 1498978, at *5 (N.D. Ala. Apr. 4, 2013) ("The court finds that, because the ALJ mischaracterized the evidence relied on to discredit Mr. Baker's pain testimony, the ALJ's credibility determination is not supported by substantial evidence.").

In concluding that Nichols could lift and carry twenty pounds occasionally and ten pounds frequently, in concluding that she could walk for about six hours in an eight-hour workday, and in rejecting Dr. Adediji's opinion that Nichols was limited to seated work and could not lift more than ten pounds, the ALJ relied heavily on Dr. Heilpern's February 13, 2019 conclusions, based on a review of the medical record as it existed at that time. (R. 43; R. 103-09.) As Nichols points out, and as Dr. Heilpern states in his opinion, he formed his opinion shortly after Nichols's December 2018 left knee replacement surgery. Dr. Heilpern stated that Dr. Adediji's opinion was "currently supported" by the medical record, but he nevertheless disagreed with Dr. Adediji's opinion because Nichols had just

37

undergone knee surgery; Dr. Heilpern expected that Nichols's left knee would continue to improve[9] and that, within twelve months, she would not be as limited as Dr. Adediji suggested she would be. (R. 107.)

The ALJ stated that Dr. Heilpern's opinion was supported by and consistent with the record as a whole, including diagnostic findings and Nichols's treatment history and diagnostic imaging. The medical record as a whole, including treatment history, diagnostic findings, and diagnostic imaging does not in any way support Dr. Heilpern's expectation that Nichols's symptoms would improve, and that expectation was Dr. Heilpern's stated basis for the difference between his opinion and Dr. Adediji's. The medical record as a whole includes records of a full year of treatment after Dr. Heilpern's record review – records from which it could be determined whether Dr. Heilpern was correct in assuming that Nichols's symptoms would be better in one year after she had recovered from left knee surgery. The ALJ was in possession of those medical records, and, as a whole, those records, including diagnostic findings and treatment history, demonstrated that Nichols's impairments continued to degenerate significantly. (*See generally* Section II of this Recommendation.) Among other things, by the time of the hearing before the ALJ, Nichols's multiple treating physicians concluded that she needed surgery on her right knee and surgery for her cervical spine, and she was being treating her for a rotator cuff injury. Whether or not the ALJ was correct in finding that Dr. Heilpern's opinion that the *left knee*

---

[9] Following her December 18, 2018 left knee replacement, Nichols underwent physical therapy for her left knee and back until March 1, 2019. (R. 372,  400-03, 440.)

would improve was borne out by the medical record, the ALJ was not entitled to ignore the longitudinal trajectory medical record as a whole, including diagnostic findings and diagnostic imaging, that belied Dr. Heilpern's optimism. The ALJ's stated basis for crediting Dr. Heilpern's opinion is not supported by substantial evidence. *See Collier*, 407 F. Supp. 3d at 1215 ("Although the ALJ stated that he 'review[ed] the evidentiary record in its entirety,' the ALJ failed to consider the claimant's longitudinal treatment history with multiple doctors and, therefore, did not examine the evidence in its totality."); *see also Moore v. Saul*, No. 1:18-CV-768-WC, 2019 WL 4145515, at *9 (M.D. Ala. Aug. 30, 2019) ("Plaintiff's testimony is consistent with the opinions of his physicians and is not contradicted by any findings in the medical records. Therefore, to the extent the ALJ held that Plaintiff's subjective pain testimony is not credible, such decision is not supported by substantial evidence and is due to be reversed and remanded.").

The ALJ also discredits the opinion of Dr. Adediji as not supported by Dr. Adediji's findings or by the medical record as a whole. Though the medical record as a whole supports Dr. Adediji's opinion and does not contradict or undermine it, the court will not address whether the ALJ erred in finding that Dr. Adediji's opinion was unsupported by his own findings or in disregarding Dr. Adediji's opinion. The ALJ also dismissed the temporary handicap parking permit and the temporary work excuse as not indicative of disability due to their temporary nature. (R. 44.) The court does not need to address these matters because, even if the ALJ did properly discredit Dr. Adediji's opinion, the handicap

parking permit, and the temporary work excuse,[10] the ALJ's opinion nevertheless is unsupported by substantial evidence, and the ALJ failed to follow the proper legal standard by stating adequate reasons for disregarding Nichols's subjective statements as to the limiting effects of her pain. Accordingly, this case is due to be remanded.

In finding that the ALJ erred in disregarding Nichols's subjective complaints about the extent to which pain and other symptoms from her combined impairments limited her ability to lift, walk, and stand, the court is not reweighing the evidence, nor is the court making a finding contrary to the ALJ's as to the extent to which Nichols's impairments limited her ability to lift, walk, and stand. The court merely concludes that the evidence that the ALJ specifically articulated as the basis of his conclusion is not substantial evidence; that is, the ALJ did not explicitly state an adequate basis for rejecting Nichols's subjective statements as required by the applicable legal standard. Even if there is evidence to support the ALJ's findings other than the insubstantial evidence ALJ articulated, the court cannot affirm without impermissibly weighing the evidence. *See Robinson v. Astrue*, No. 3:11-CV-3102-RDP, 2012 WL 4344547, at *8 (N.D. Ala. Sept. 13, 2012) (citing cases in support of the observation that "[t]he Eleventh Circuit has consistently held that mistakes as to weight and credibility constitute[] a prejudicial error on the part of the ALJ").

On remand, the ALJ should examine Nichols's subjective complaints of pain in accordance with the applicable legal standards and the medical record as a whole. The ALJ is not required to accept Nichols's subjective statements regarding the limiting effects of

---

[10] The court makes no finding as to the propriety of the ALJ's decision to discredit this evidence.

her impairments, but if he does not do so, he must show good cause by clearly articulating reasons that are supported by substantial evidence. *See Moore*, No. 1:18-CV-768-WC, 2019 WL 4145515, at *9 (M.D. Ala. Aug. 30, 2019) ("[T]o the extent the ALJ held that Plaintiff's subjective pain testimony is not credible, such decision is not supported by substantial evidence and is due to be reversed and remanded. Accordingly, this matter is due to be reversed and remanded so that the ALJ may reconsider his rejection of Plaintiff's pain testimony." (citing *Cavarra*, 393 F. App'x at 616)).

## C. Remaining Arguments

Because the case is being remanded to the Commissioner for further consideration, the court need not address Nichols's remaining arguments. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (finding that, where remand was required, it was unnecessary to review other issues raised) (citations omitted); *see also McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960, 963 n.3 (11th Cir. 2015) (per curiam) (finding no need to analyze other issues when the case must be reversed due to other dispositive errors). On remand, the Commissioner should reassess the entire record, providing sufficient reasons and readily identifiable evidentiary support for his decision under the applicable law. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (holding that, on remand, the ALJ must reassess the entire record) (citation omitted).

## VI.   CONCLUSION

After review of the administrative record, and considering all of the arguments, the court finds the Commissioner's decision is not supported by substantial evidence for the

reasons stated above. Hence, the undersigned RECOMMENDS as follows:

1.    The Claimant's motion for summary judgment (Doc. No. 15) be granted.

2.    The Commissioner's motion for summary judgment (Doc. No. 19) be denied.

3.    The decision of the Commissioner be reversed and remanded to the Commissioner for further proceedings not inconsistent with this Recommendation, in accordance with sentence four of 42 U.S.C. § 405(g).

Further, it is ORDERED that the parties shall file any objections to this Recommendation on or before **April 24, 2023**. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Plaintiff is advised that this Recommendation is not a final order of the Court; therefore, it is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1; *see Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 7th day of April, 2023.

_Jerusha T. Adams_
_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE